IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOHNNY C. GAGHINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-CV-564-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

# OPINION AND ORDER

Claimant, Johnny C. Gaghins ("Gaghins"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Gaghins' application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Gaghins appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Gaghins was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

## Plaintiff's Background

Gaghins was born on August 31, 1959 and was 48 at the time of the ALJ's decision. [R. 664]. Gaghins graduated from high school and attended about one and one-half years of college. [R. at 665]. He was in active duty for the United States Air Force from February until December 1979 when he received an honorable medical discharge due to injuries to his lower right back and right hip, knee, ankle and foot sustained in an explosion. Claimant alleges an

inability to work beginning July 1, 1995, due to an injury to his left wrist, hand and ring finger. [R. 666]. He also claims to suffer from right knee and ankle edema, tendinitis in his right shoulder, inactive Hepatitis C, "legal" blindness, migraine headaches, bone spurs in his right foot, history of hernias and scapholunate ligament tear, and instability in his right leg which requires him to use a leg brace and cane. [R. 668-82].

At the time of the last hearing, Gaghins was incarcerated in a state correctional facility. [R. 663]. Gaghins testified that he could stand up to 30 minutes before having to sit, sit 15-20 minutes before having to stand, walk about 50 yards before taking a break; could not use his left arm and hand; had difficulty reaching with his right arm; and was irritable from the pain and had difficulty concentrating when on pain medication. [R. 682-86]. He further testified that he was classified as "medically restricted" and the only chores he is given in prison are keeping his cell swept and dusted and his bunk made. [R. 679].

Gaghins was examined by Kenneth R. Trinidad, D.O., on February 13, 1996 for an injury to his left wrist he sustained as a result of a slip and fall at work on March 25, 1994. [R. 190]. Dr. Trinidad concluded that Gaghins' wrist and hand had achieved maximum medical recovery and he had a 42% impairment to his left hand as contributed to by injuries to his left wrist. [R. 188]. He noted the impairment would include persistent pain, stiffness, and "crepitance" in the wrist, range-of-motion restrictions and weakness in wrist strength and grip strength. *Id*. Dr. Trinidad opined that Gaghins would be unable to return to his position as a heat and air conditioning repairman, and would require vocational retraining for a light duty position. *Id*. He recommended referral to an orthopedic hand specialist.

The orthopedic hand specialist Gaghins consulted was David K. Wong, M.D. [R. 179-86]. Gaghins had surgery on his left wrist on August 21, 1996. [R. 182-83]. There were no complications reported. [R. 183]. Gaghins had "follow-up evaluations" on November 5 and

December 5, 1996, with Dr. Wong. [R. 184-86]. Gaghins' grip strength on the left side was 30 pounds as compared to 100 pounds on the right side. [R. 185]. Gaghins' pinch grip was ten pounds for the left as compared to 23 pounds for the right. Range-of-motion for the wrist was extension 65 degrees, flexion 50 degrees, ulnar deviation 25 degrees, radial deviation 15 degrees, supination 85 degrees and pronation 85 degrees. *Id*. Gaghins was found to have achieved maximum medical benefit, though not pain free. Dr. Wong determined that Gaghins had a 25% permanent partial impairment to his left wrist and noted that it was unlikely that Gaghins could return to his past work as a heating and air conditioning repairman. *Id*. He suggested that Gaghins be retrained for less strenuous work that did not include vibrating tools and heavy gripping, lifting more than 5 pounds with his left hand, or assembly line or production-based work. [R. 185].

Gaghins received medical treatment from the Department of Veterans Affairs ("VA") Outpatient Clinic from March 8, 1995 to November 22, 2002. [R. 193-319, 336-428].

On May 11, 2001, Gaghins complained to Wallace B. Love, M.D., of right knee pain and instability. Dr. Love wrote a letter to the VA on Gaghins' behalf dated June 29, 2001 noting that Gaghins suffered falls in 1995 and 2000 due to instability of his right knee and opined that he was unable to attend heating and air-conditioning school. [R. at 209, 267].

On December 13, 2001, Gaghins' knee was evaluated by an orthopedic specialist who recommended a MRI., noting signs and symptoms consistent with a meniscal tear. [R. 219]. Gaghins continued to complain of buckling of his right knee and pain in his right leg, hip and low back in subsequent visits to the VA.

There are several radiographic tests in the record. The x-rays of Gaghins' right knee showed early degenerative changes on January 19, 2001 but were normal on June 12, 2001. [R. 309]. The x-rays of his right hip dated January 24, 2001 showed osteoarthritis in the right hip.

[R. 307]. The MRI of his lumbar spine dated July 30, 2001 revealed degenerative disc disease at L1-L2. [R. 265]. And a bone scan dated January 4, 2002 showed degenerative disc disease in his upper cervical and right lower thoracic vertebrae, arthritis in bilateral upper and lower extremity joints, and resolution of the post-traumatic left hand abnormalities shown in his previous scan in June 1995. [R.302].

Gaghins was evaluated by the VA on January 4, 2002. [R. 210-17]. Gaghins was evaluated as having spondylosis of the lumbar spine with 10% disability due to pain and limitation in motion, degenerative joint disease in the right knee with 10% percent disability, and 20% disability in the right knee based on moderate lateral instability of the knee. [R. 213].

On February 1, 2002, Gaghins underwent psychological testing due to complaints of depression. [R. 338-39]. Gaghins was noted as having a current GAF[1] of 50 and depression secondary to chronic pain and some loss of mobility. [R. 339].

On March 11, 2002, Gaghins reported falling ten days previously while walking in his garage. [R. 231]. Gaghins stated that his right knee gave way, his ribs hit a cabinet and he blacked out. *Id*. Gaghins requested a different brace to provide more support. [R. 232].

Gaghins was hospitalized from November 18 through 22, 2002 due to a suicide attempt by prescription overdose. [R. 370-428]. Gaghins reported increasing mood swings, auditory hallucinations, anxiety and anger outbursts, forcing his wife and four children to move out of the house in October. [R. 373]. Notes also indicate that Gaghins' wife had a protective order against

---

[1] The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 32-36 (4th rev. ed. 2000). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

him, and that DHS Child Protective Services had ordered Plaintiff not to see his children absent supervision because of his abusive behavior. [R. 391]. Gaghins reported significant and chronic lower back pain. The reviewer noted that Plaintiff appeared to be in a lot of pain because he could not stay in any one position and periodically had to get up to walk. [R. 393]. Gaghins was assessed with major depression disorder, alcohol abuse and a GAF of 21 on admission and 26 upon discharge. [R. 403].

A Physical Residual Functional Capacity Assessment form was completed on April 18, 2002, by Thurma Fiegel, M.D. [R. 321-28]. She assessed that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for six hours in an eight hour day, and sit for six hours in an eight hour day. [R. 322]. A second Residual Physical Functional Capacity Assessment form was completed May 7, 2002, with identical restrictions marked. [R. 329].

**Procedural History**

On January 24, 2002, Gaghins protectively filed an application seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq.* [R. 119-121]. His date last insured was September 30, 2000. The applications were denied initially and on reconsideration. [R. 100-101]. A hearing before ALJ Lantz McClain was held on March 23, 2004 in Tulsa, Oklahoma, with Gaghins appearing by telephone. [R. 59-99]. The ALJ denied his application on May 28, 2004. [R. 25-37]. On December 2, 2004, the Appeals Council denied review of the ALJ's findings. [R. 5-8]. The case was appealed to this court and the decision was reversed and remanded for further consideration on March 10, 2006. [R. 501-516].

A second hearing before ALJ Gene M. Kelly was held on August 29, 2006 with Gaghins appearing by telephone. [R. 611-656]. The ALJ denied Gaghins' application on November 8, 2006

and Gaghins filed written exceptions to the decision on November 27, 2006. [R. 492-500, 525-527].

On January 30, 2008, the Appeals Council remanded the decision directing the ALJ to contact Gaghins' treating physician, Dr. David Wong, to clarify his opinions regarding the amount of weight Gaghins could carry and lift with his left hand or retain a medical expert witness, and further evaluate Gaghins' subjective complaints. [R. 530-531].

A third hearing was held on July 1, 2008 in Tulsa, with Gaghins again appearing by telephone. [R. 657-696]. The ALJ entered his Reopened and Revised Decision on August 19, 2008 denying Gaghins' request for benefits. [R. 441-474]. The Appeals Court declined review on July 19, 2010. [R. 432-35]. Gaghins thus appeals this decision.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[2] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[2]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Gaghins' date last insured was September 30, 2000. [R. 447]. At Step One, the ALJ found that Gaghins had not engaged in any substantial gainful activity during the relevant period, from Gaghins' alleged onset date of July 1, 1995 to September 30, 2000. *Id.* At Step Two, the ALJ found that Gaghins had the following impairments as of September 30,

---

residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

2000: "knee, back, arm, hernia, hepatitis C, history of scapholunate ligament tear, left wrist." [R. 448, 456-57].[3] At Step Three, the ALJ found that Gaghins' impairments did not singly or combined meet a Listing, specifically Listings §§ 1.00, 2.00, 4.00, 5.00, 6.00 and 12.00." [R. 457-58].

>The ALJ determined that Gaghins had the following RFC:
>
>[C]laimant retains the residual functional capacity to lift/carry up to ten pounds at a time with the right upper extremity, using the left hand as a helper if necessary; stand/walk at least two hours of an eight hour day, occasionally perform postural functions such as crouching, kneeling, crawling, or pushing/pulling with the lower extremities, or reaching overhead; but she [sic] cannot perform work requiring good visual acuity or work which exposes the claimant to a cold or damp environment, and he is restricted to the performance of routine work related functions, is restricted to a low noise and low light environment; needs easy access to a latrine; and needs to change position from time to time. The claimant is susceptible to a mild to moderate degree of pain, but not to the extent of being unable to be present and attentive at a work site performing routine work related tasks. The claimant is limited to a reduced range of sedentary work as defined in 20 CFR 404.1567(a). Further, during the period July 1, 1995 through September 30, 2000, the claimant had the capacity to perform routine work related functions which did not require lifting or carrying of more than ten pounds occasionally, which lifting/carrying the claimant was able to perform with the dominant right hand, and was able to use the left non-dominant hand as a helper if necessary for balancing or support, with a limit of lifting/carrying no more than five pounds at a time with the non-dominant left hand, and was not able to perform work requiring reaching, pushing, pulling, twisting, turning or constant repetitive motion of the left hand, work requiring the use of vibrating tools, or work requiring repetitive bilateral fingering or manipulation.

[R. 458]. At Step Four, the ALJ found that Gaghins could not perform his past relevant work as a heating and air conditioning worker or auto painter; however, he cited Cheryl Mallon's ("Mallon"), the Vocational Expert ("VE"), testimony in finding that, based on Gaghins' age,

---

[3] The ALJ noted, however, that after the date last insured, Gaghins' condition had progressively "worsened and degenerated with the development of severe conditions involving and/or relating to colon, liver, hip, vision, shoulder, ankle, in addition to the problems involving and/or relating to problems with his knee, back, arm, hernia, hepatitis C, and history of scapholunate ligament tear, left wrist." [R. 448].

education, work experience and RFC, Gaghins "would be able to perform the requirements of representative occupations such as laundry sorter, which is unskilled and sedentary work, and of which there are some 540 jobs in Oklahoma, and some 65,000 jobs nationally, and labeler, which is unskilled and sedentary work, and of which there are some 700 jobs in Oklahoma and some 48,000 jobs nationally." [R. 473]. Therefore, the ALJ found that Gaghins was not disabled during the relevant period - July 1, 1995 through September 30, 2000. *Id.*

### Review

Gaghins raises the following objections to the ALJ's decision: (1) the ALJ committed procedural errors requiring remand; (2) the ALJ failed to perform a proper step 5 determination; and (3) the ALJ failed to perform a proper credibility determination.

Gaghins contends that the ALJ erred in reopening and revising the final decision without including the original decision in the record and in failing to comply with the Appeals Council's directions to recontact Dr. Wong or obtain the services of a medical expert witness. He asserts that these procedural errors require remand.

The Court disagrees. Gaghins argues that the ALJ's failure to place the "original" decision in evidence violates his due process rights as he has "no idea what the original decision said, or indeed if the original decision was not fully favorable to him." [Dkt. #15 at 2]. However, the ALJ explained in his "Reopened and Revised Decision" that the Office of Disability Adjudication and Review had recently instigated a process by which hearing decisions were electronically signed and that he had prematurely signed a working draft of the decision and, accordingly, styled the final decision as a "Reopened and Revised Decision." [R. 445]. He further explained that the "only changes are corrections of typographical errors without change, amendment, or substantive alteration in narrative, reasoning, facts, interpretation, findings or

9

conclusion otherwise." *Id*.

Neither is the ALJ's failure to recontact Dr. Wong or consult with a medical expert witness reversible error. In his 31-page decision, the ALJ exhaustively explains why further contact with Dr. Wong or a medical expert witness was not necessary. On remand, the Appeals Council pointed out the following deficiency in the ALJ's November 8, 2006 decision:

> The November 8, 2006 decision discussed the medical opinion of the treating physician, David Wong, M.D. Although Dr. Wong expressed the opinion that the claimant could not lift more than 5 pounds with his left hand, the decision found that the claimant could lift 10 pounds with his left hand because he had a grip strength of 30 pounds in that hand. The Administrative Law Judge asserted that the 10 pound weight limit for lifting and carrying was not inconsistent with Dr. Wong's opinion because grip strength was correlated with the ability to lift and carry. However, on the same page Dr. Wong stated that the claimant had grip strength of 30 pounds in the left hand, he also stated that the claimant was restricted to lifting no more than 5 pounds with the left hand. It should be noted that the claimant has a wrist impairment. It is possible that the claimant could use his hand to exert 30 pounds of pressure on testing and not be able to sustain that weight with his wrist. Dr. Wong was not asked to provide additional information or clarification of his two opinions, and the Administrative Law Judge did not obtain evidence from a medical expert to provide additional medical input.

[R. 530] (citations omitted). The Appeals Council thus directed the ALJ to contact Dr. Wong and "ask that he clarify his opinions with respect to the weights the claimant can lift with his left hand and the weight the claimant can carry with his left hand during the period under consideration. If the information is not forthcoming, the Administrative Law Judge may obtain the testimony of a medical expert to clarify the nature and severity of the claimant's impairment." [R. 531].[4]

The ALJ, however, explained that his prior decision did not conflict with Dr. Wong's

---

[4] The ALJ also noted that the District Court initially remanded this case based on that ALJ's finding that Gaghins could lift or carry ten pounds occasionally although Dr. Wong had opined after Gaghins' August 1996 surgery that Gaghins could return to work "with a restriction of lifting no more than 5 pounds with the left hand and unlimited for the right hand." [R. 464, 185].

10

assessment and thus, further confirmation from Dr. Wong or a medical expert witness was not required. The ALJ pointed out that Dr. Wong's opinion regarding Gaghins' left wrist limitation took into consideration that his "[g]rip strength on the left side is 30 pounds on setting two versus 100 pounds on the right side. Pinch grip is 10 pounds for the left versus 23 pounds for the right." [R. 467, 185]. The ALJ explained that Dr. Wong expressly opined that -

> The claimant was not pain free, and likely could not expect to be wholly pain free; the claimant sustained a 25% permanent partial impairment to his left wrist; the claimant should be able to return to work with no restriction on lifting/carrying with the right dominant hand and a five pound limitation on lifting/carrying with the non-dominant left hand; the claimant could not return to his past work in heating and air conditioning; the claimant should avoid using heavy vibrating tools, and, the claimant would be restricted to "very light repetitive activities as long as they are not assembly line or production-based work."

[R. 467-68, 185]. The ALJ clarified that he accepted Dr. Wong's assessment of Gaghins' lifting/carrying capacity in finding that Gaghins was "able to perform sedentary lifting/carrying of up to at least ten pounds with the dominant right hand" as the lifting/carrying requirement necessary for sedentary work is "ten pounds with either hand, not ten pounds with each hand" and the "inability to lift-carry zero pounds with one upper extremity, or amputation of one upper extremity, or immobilization of one upper extremity, is not disabling per se." [R. 468](emphasis in original). The ALJ continued:

> The claimant's treating physician assessed a clear and unequivocal lifting/carrying limitation of five pounds with the left hand, no limitation with the right hand. Although the work related actions wherein a claimant is restricted, limited, or incapacitated from performing work related functions with the hands bilaterally must be considered in determining whether a significant number of jobs exist which an individual can perform notwithstanding the individual's severe impairments, bilateral lifting/carrying capacity of ten pounds with each hand is not a factor in lifting/carrying up to ten pounds required for sedentary work.

[R. 468-69]. Thus, "[t]here is absolutely no adjudicative need whatsoever to maximize the

11

claimant's non-dominant left hand lifting/carrying capacity above five pounds" and the ALJ "makes no objection to and enters no caveat to the validity, reliability, accuracy and credibility of Dr. Wong's assessment." *Id*.

Given the ALJ's explanation of his RFC findings, the Court finds no basis for reversal in his failing to seek clarification from Dr. Wong or the testimony of a medical expert, as there is no conflict with Dr. Wong's opinion on Gaghins' ability to lift ten pounds.

The Court, however, has concerns with the ALJ's Step Five determination. The ALJ relied on the following hypothetical and VE Cheryl Mallon's ("Mallon") testimony regarding the number of available jobs given the above RFC, Gaghins' age, education and work experience. Assuming that a claimant has "mild to moderate chronic pain which is of sufficient severity so as to be noticeable to him at all times, but that nonetheless, he will be able to remain attentive and responsive in a work setting, and can carry out normal work assignments satisfactorily," that he will "find it necessary to change position from time to time to relieve his symptomatology," and he takes medications which would not "preclude him from functioning at the sedentary and light level as restricted, and he will remain reasonably alert to perform required functions presented in the work setting," the ALJ propounded the following hypothetical:

> 48-year-old male; high school plus education; good ability to read, write, and use numbers; again, sedentary and light [work]; lift and carry to – actually, this will be sedentary. Lift and carry to 10 pounds; stand and walk two hours in eight at 30 minutes; to sit six hours in eight at two-hour intervals; occasional climb, bend, stoop, squat, kneel, crouch, crawl, push/pull, operate foot controls, reach overhead, twist the torso; a slight limitation in finger, feel, and grip. He can use his hands and fingers; he shouldn't be doing small, tedious tasks with them, like pin and clip fastening or working with small nuts and bolts; avoid fine vision, and this kind of goes with it, he can use his eyes, but again, he shouldn't be doing small, tedious tasks with his eyes; low-noise and low-light environment. I'm not going to rule out routine, ordinary noise or light, commercial, education, business type noise and light environments; but he shouldn't be out on a bright, sunny day flagging trucks, working around bright photo floods, working on noisy foundry

floors. Avoid rough, uneven surfaces, unprotected heights, fast and dangerous
machinery, avoid cold and damp, and should have easy access to rest rooms.
We'll note the depression and the anxiety, and a history of substance abuse. We
will keep the work simple, repetitive, and routine. I'm attempting to limit stress
and content with that restriction. And I want to have a slight limitations in
contact with the public, coworkers, and supervisors. Contact with public should
be brief and cursory. It can be repetitive, but it has to be brief and cursory. Fast
food worker, it's brief, its' cursory, it's repetitive. It falls within what I consider
appropriate for this restriction. A bank teller may be brief, but it may not be
cursory enough. It may be more complex than I'm anticipating. A clothing
salesperson may not be very complex, but it may be more prolonged than I'm
anticipating. In dealing with coworkers, this person could work on an assembly
line. I don't see the restriction by itself restricting work on an assembly line. But
he shouldn't be an integral member of a team that's going to participate in goal
setting, process planning, things of that nature. I do not intend to restrict routine,
ordinary supervision.

[R. 689-90]. Based on the above, Mallon concluded that such limitations would eliminate light work due to "limitations in slight finger/feel, the fine vision, and the public contact," but that the claimant could still do "sedentary assembly work, 167,000 in the nation, and 20,000 in the region, DOT number 732.684-062. Sedentary order clerk, 107,000 in the nation, and 13,000 in the region, DOT number 209.567-014," although only 50% of those jobs. [R. 689-91]. Mallon confirmed that these jobs and their numbers would not be affected by the further limitation on lifting no more than 5 pounds with his left hand. [R. 691]. She testified that there would be 250 sedentary order clerk jobs and 400 assembly work jobs available in Oklahoma.[5] [R. 694].

Inexplicably, however, the ALJ cited the VE's testimony as follows:

---

[5] The exchange between Plaintiff's counsel and Mallon was at follows:
Q. The, the numbers of jobs that you, that you stated were in the region, could you tell me how many of those jobs exist in the state of Oklahoma?
A. Are we talking about the sedentary jobs?
Q. Correct.
A. I believe about 500 of the machine operating – the order clerk, and about 800 of the assembly work.
Q. That's before the [50%] reduction?
A. Right.
[R. 694].

13

> The vocational expert testified that, given all of these factors, the individual
> would be able to perform the requirements of representative occupations such as
> laundry sorter, which is unskilled and sedentary work, and of which there are
> some 540 jobs in Oklahoma, and some 65,000 jobs nationally, and labeler, which
> is unskilled and sedentary work, and of which there are some 700 jobs in
> Oklahoma and some 48,000 jobs nationally.

[R. 473]. Based on the above, the ALJ concluded that there were significant numbers of jobs Gaghins could perform, although neither of these occupations or their numbers were identified by Mallon.

The Commissioner argues that this is simply a "scrivener's error" that does not warrant remand, citing *Poppa v. Astrue*, 569 F.3d 1167, 1172 n.5 (10th Cir. 2009). *Poppa*, however is distinguishable. In *Poppa*, the Tenth Circuit found that the ALJ's incorrect reference to the claimant's prior surgeries as occurring in "early 2004" rather than early 2005 was a "mere scrivener's error" that did not affect the outcome of the case as the "ALJ had noted the correct date of the surgeries earlier in his decision." *Id*. Here, there is nothing in the decision to substantiate that the ALJ depended on Mallon's testimony regarding available jobs and their numbers which Gaghins could perform. In fact, it appears that the ALJ mistakenly relied on VE Angharad B. Young's ("Young") testimony from the prior August 29, 2006 hearing, where Young identified available jobs as "sorter" requiring "unskilled sedentary exertion" with 540 such jobs in Oklahoma and 65,000 nationally, and "labeler," "an unskilled position SVP:2 and sedentary exertion" with 700 such positions in Oklahoma and 48,000 nationally. [R. 648]. Even if this is the case, such does not render the error harmless as the hypotheticals presented to Young at the August 29, 2006 hearing and to Mallon at the July 1, 2008 hearing are not identical; nor are the RFCs upon which they rely. Further, the number of available jobs identified by the VEs differ significantly, with Mallon's number (total of 650 jobs in Oklahoma)

14

only half of that found by Young and relied on by the ALJ (total of 1240 jobs in Oklahoma).

In addition, although, as the Court noted above, the ALJ adequately addresses Dr. Wong's finding that Gaghins be restricted to only 5-pound lifting with the left hand, he muddied the waters about the kind of "very light repetitive activities" Gaghins can do in the RFC determination and in the hypotheticals to Mallon. The ALJ correctly cites Dr. Wong's opinion that the claimant would be restricted to "very light repetitive activities *as long as they are not assembly line or production-based work*." [R. 468] (emphasis added). However, the ALJ does not state such in his RFC or in his hypotheticals to Mallon.

In sum, the Court finds that the ALJ did not meet his burden at Step Five.[6]

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 3rd day of January, 2012.

_____
Paul J. Cleary
United States Magistrate Judge

---

[6] Having so found, the Court does not reach the credibility analysis issue.

15